JENNESS & A. *v.* WENDELL.

The plaintiff sold the furniture in his hotel and his stable stock at the same auction, and all upon the same terms and conditions; and the defendant purchased a large number of separate articles, upon as many separate bids, and at separate and distinct prices, many of which were less than $33.00. This was regarded as an entire contract for the whole of the property thus purchased by the defendant at the aggregate price, and will thus be within the statute of frauds, if the aggregate price exceeds $33.00.

In such case, a delivery and acceptance of a part of the goods will take the entire contract out from the operation of the statute of frauds.

And it would make no difference whether the sale was completed in one day, or extended through two or more days.

Where the terms of the sale are "cash on delivery," the vendor may hold a lien upon the property until the price is paid, if he chooses; or he may waive the payment and relinquish the lien, in which case the title to the property will vest in the purchaser from the time of the sale.

A declaration for goods sold and delivered may be amended by adding a count for the same goods bargained and sold, without changing the form or the cause of action.

ASSUMPSIT, by Job Jenness and others against Henry F. Wendell on an account annexed, and for goods sold and delivered. Subject to the defendant's exception, the plaintiff was allowed to amend by adding a count for goods bargained and sold. June 3d, 4th, and 5th, 1862, the plaintiffs sold at auction the furniture in their hotel at Rye Beach, and their stable stock used in connection with the hotel. One Walker was the auctioneer. The terms of the auction were cash on delivery. The defendant bid off stable stock to the amount of $163.50, which was taken away by the defendant at the time of sale, and paid for since the commencement of this suit. The defendant also bid off furniture in numerous lots, no lot amounting to $15, all amounting to $196.12. The hotel and the furniture bid off by the defendant were burned June 22, 1863. The question was, whether the plaintiffs could recover $196.12, the amount of the prices at which the defendant bid off this furniture: excepting 1 fireboard, .37; curtains, .50; 1 picture, 1.13; 1 piano cover, 1. 50,—$3.50.

This furniture consisted of carpets fastened upon the floors and stairs where they had been in use. Before the auction the plaintiffs had measured the carpets, and made a schedule of them and of the number of yards in each lot, and of all the property sold, each lot being numbered on the schedule; and the property was sold by the schedule, the auctioneer offering each lot by itself as a carpet containing the number of yards named in the schedule, and they were struck

off to the person bidding the highest price per yard. The hotel was offered and bid off at the same auction by one Scammon, but no deed had been executed when the furniture was burned, and the plaintiffs had the legal possession of the hotel until the furniture was burned.

The counsel of both parties, being called upon by the court, stated that there was no question of fact for the jury except the following : The defendant introduced testimony tending to show that, about a fortnight after the auction, on the Wednesday next preceding the Saturday on which the house was burned, the plaintiffs requested the defendant to leave the carpets where they were till the first of the next week for the accommodation of the plaintiffs, as some persons wanted to look at the hotel with a view to a purchase of it, and it would look better with the carpets in it ; and that in consequence of this request the carpets were not taken away by the defendant before the fire.

The plaintiffs introduced evidence tending to show that the plaintiffs suggested to the defendant that the carpets would be worth more to the purchaser of the hotel than to any one else, and that the defendant, who had bought them to sell again, might sell them to the purchaser of the hotel ; and that this suggestion was made for the defendant's and not for the plaintiffs' benefit.

By agreement of the parties, the case was taken from the jury and reserved, such judgment to be rendered as the court should order.

*W. H. Y. Hackett,* for the plaintiffs.

I. The moment the auctioneer's hammer went down, the carpets, &c., became the property of the defendant. 1 Parsons Con. 403, 445 ; 2 Parsons Con. 32<sup>0</sup> ; do. 290, 291.

II. The auctioneer. was agent of both parties, and his entry of the defendant's name and price on a schedule headed by the plaintiffs' name, offering the carpets in lots, &c., binds both parties. 2 Parsons Con. 293.

III. The defendant, by his testimony, admits that about two weeks after the sale, upon the plaintiffs' application, he agreed that the carpets might remain a few days, which was a recognition by both parties that the property had passed and been delivered. It was like a parcel of goods purchased and done up and set apart for the purchaser to call for. 1 Parsons Con. 443.

IV. In considering this question, all the articles purchased by the defendant are to be regarded as one sale, and the receiving $163.50, nearly one half the amount, is a delivery of the whole. In any view, several of the lots are less than statute limits. 36 N. H. 318.

V. As the plaintiffs were selling their whole furniture and livery stable stock, for the sake of closing the sale of every article they may have allowed some articles to be sold at a lower rate than would have been sold under other conditions. Now, a fraud may be committed if a purchaser be allowed to select the articles purchased at under prices,

and to leave those articles the price of which induced the sales of other articles below price. 1 Parsons Con. 417.

*Hatch,* for the defendant.

I. The action for goods sold and delivered cannot be maintained, because there was no actual delivery. The plaintiffs must show, not only that the property of the goods had vested in the defendant, but that they were actually or virtually delivered, and that the plaintiffs had divested themselves of all lien upon the goods, so that the defendant might obtain trover for them without paying or offering to pay. Saunders Pl. & Ev. 536; *Messer* v. *Woodman,* 22 N. H. 177; *Ward* v. *Shaw,* 7 Wendell 407; *Parker* v. *Mitchell,* 5 N. H. 165; *Hart* v. *Tyler,* 15 Pick. 171. The case of *Messer* v. *Woodman,* was well considered, and is almost identical with the present in all its particulars. In the present case as in that, two things remained to be done before the property passed to the defendant.

1. The measuring of the goods, all but $3.50 of which were sold by the yard. It is true, the plaintiffs had measured the carpets beforehand; but the defendant was not a party to that transaction, and his right to re-measure is not thereby affected. On a new measurement it it might have proved that all the measures of the plaintiffs were correctly taken : so, in the case stated in *Messer* v. *Woodman,* the means of making the amount of the sale certain were at hand. But the point is, that it never was done. *Bailey* v. *Smith,* 43 N. H. 141.

2. The goods remained the property of the plaintiffs till the price was paid or tendered. "The terms of the auction were cash on delivery." In *Messer* v. *Woodman,* "all the hay on the scaffold was sold to the defendant for $10 ;" yet the court held the sale incomplete. *Ferguson* v. *Clifford,* 37 N. H. 103; *Dudley* v. *Sawyer,* 41 N. H. 326.

II. The question of the applicability of the statute of frauds is, perhaps, settled in the cases cited in *Messer* v. *Woodman.* If not, the defendant insists that the sale of the stable stock was a separate transaction, so treated by the parties, effected probably on a different day, and not connected with the matters in suit. The sale of the household goods has been treated as a single transaction by the parties, and is included in a single count in the declaration. *Janes* v. *Shore,* 1 Stark. 426, which seems to bring the case within the statute of frauds.

III. The amendment to the declaration changed the substance of the action, and ought not to have been allowed—*Butterfield* v. *Harvell,* 3 N. H. 201; *Merrill* v. *Russell,* 12 N. H. 78; and it is not a sound exercise of the discretion of the court to allow such an amendment after an action has been pending, as this had four years and six months. *Baker* v. *Davis,* 22 N. H. 27.

IV. But if allowed, it does not aid the plaintiffs. The count for goods bargained and sold proceeds upon the alleged fault of the defendant in not taking delivery of the goods and completing the contract. But the case shows that the defendant is in no fault. The goods were

never tendered to him ; he was never requested to take them away. In fact, the delay to deliver the goods was at the request of the plaintiffs, and for their benefit. The defendant is still ready to accept the goods, as he always has been ; it is the misfortune of the plaintiffs that they cannot deliver them.

SARGENT, J. It seems to have been *questio vexata,* when an estate (real) was sold by auction in separate lots, and the same person became the purchaser of several lots, whether a distinct contract arose as to each, or whether there was but one contract as to the whole. But the better opinion appears to be, at least *at law,* that a distinct contract is created as to each lot,—though it would be otherwise when a written contract is afterwards entered into and signed for the purchase of several lots at an aggregate price. Chitty on Con. 298 ; *Johnson* v. *Johnson,* 3 B. & P. 169 ; *Roots* v. *Lord Dormer,* 4 B. & Ad. 77 ; *Poole* v. *Shergold,* 2 Bro. Ch. 118 ; *Seaton* v. *Booth,* 4 Ad. & E. 528.

In *Dykes* v. *Blake,* 4 Bing. N. C. 463, two lots of land were sold at auction separately to the same person, but at the close of the sale one agreement was entered into for the sale of both lots at the aggregate price. *Held,* that a material misdescription of one lot would entitle the purchaser to rescind the contract as to both.

In *Van Eps* v. *Schenectady,* 12 Johns. 436, plaintiff had purchased thirty-three lots of land at auction, at as many separate sales, on the same day, paying a distinct and separate price for each lot, and took thirty-three separate certificates, one of each lot ; and the plaintiff having paid for all his lots, and the defendant not being able to make good title to three of the lots,—*held,* that this was not an entire contract, and that the vendee could not rescind the contract *in toto,* but must take a conveyance of such lots as defendant could convey with good title, and might recover back with interest the money paid upon the lots to which defendant could give no title. *Held,* also, that the vendor was obliged to give separate deeds of the several lots, if required, and his offer to execute one deed for the whole did not render the contract entire.

From these last two cases it would seem that the contract will be considered to be entire for several lots, or separate for each lot, much more according to the circumstances of each case and the way the business was finally closed up between the parties, and upon their understanding and intentions in relation to the trade, than upon the fact that the lots were sold at auction, and struck off to the same party at one or at several bids.

Chitty applies the same rule to personal property, which he lays down in relation to real estate, viz., that in a sale of goods *by auction,* if several lots be put up separately and separately knocked down to the same person, and on each occasion the auctioneer writes down the vendee's name, there is in point of law a distinct and independent contract as to each lot, although the purchaser afterwards sign one memorandum that he has bought *the several lots ;* though it would be

otherwise if the memorandum were for the purchase of the several lots
at an *aggregate* price.   Chitty on Cont. 383, 404.   But it will be ob-
served that he places much stress upon the fact that the sale was *by
auction*, where the auctioneer is so far the agent of both parties that
he may bind them by signing their names to the contract.

But in this country, where household furniture, farming tools, and
such like articles about a farm or a hotel are sold, or where the sale
also includes the stable stock, as in this case, or the farm stock and
produce, we think there is ordinarily very little difference in fact be-
tween sales at an auction and a sale at any other place, or contracted
in any other way, of several ‘articles at an agreed price, which are all
put together in one account.

When the question is as to there being such a memorandum in
writing of the sale, signed by the parties or their agents, as will make
it a valid sale under the statute of frauds, it often becomes material
to consider whether the sale was by auction or otherwise.   See Brown on
Stat. of Frauds, secs. 347, 369, where the cases are mentioned in
which the same person may be the agent of both parties,—as the broker,
with his bought and sold notes and written book of entries ; the auc-
tioneer, who, when he sells the property of one, and knocks it down to the
highest bidder, becomes the agent of the bidder, as he was previously
that of the seller, to conclude the contract, and does conclude it by
entering the buyer’s name as such in his sales-book, which contains the
substance of the contract.   In the last section, he adds,—‟ This rule
applies equally to public officers not professedly auctioneers, but selling
property at public auction, such as sheriffs and their deputies, admin-
istrators, commissioners, acting under order of court, land commis-
sioners, &c.,      *   *   *   but would not extend to a mere private agent
of the vendor, assuming to sell property at auction ; nor is a commission
merchant regarded either as an auctioneer or broker, so as to enable
him to bind the purchaser of goods by a memorandum.”

The same author, in sec. 335, says,—‟ In considering the question,
when the price of the goods sold was held to amount to the sum fixed
by the statute, we saw that the prices of a number of articles, each
less than that sum, but in the aggregate exceeding it, were to be taken
together so as to bring the contract within the statute, if the pur-
chases were all made at the same time, or so connected as to show the
transaction to be one and the same ; and in like manner, the accept-
ance and receipt of one or a part of one of such parcels in a com-
bined purchase is sufficient to perfect the contract as to the whole.
It may often be a matter of difficulty to determine whether the trans-
action was one and the same.   In the common case of a number of
articles purchased at private sale of a shopman, for instance, at the
same time, though at separate prices, it is clear that the aggregate is
to be taken as the purchase.   The same has been held as to the aggre-
gate of various purchases made by a party at an auction, and also in
a case where the parties had met by appointment for the purchase of
timber, and had proceeded together to several places some miles apart,

making bargains for timber at each place, at separate prices, but all on the same day. In each of the instances referred to, there was a memorandum or bill of the whole made out and presented, and assented to by the buyer, to which fact much weight was allowed, as showing that the parties regarded the transaction as one and entire."

In the case before us, nothing is said of the memorandum which was made at the sale, if any was made, and therefore no presumptions are to be made concerning it. The questions raised are, whether these parcels of furniture, that were bid off separately, are to be treated as constituting so many separate and distinct contracts and sales, or whether the whole transaction constituted but one sale, *an entire contract.*

*Mills* v. *Hunt,* 17 Wend. 333, is a case strongly in point. In that case no question was raised concerning the memorandum of the sale, but simply whether each bid at an auction, by the same party, at which a lot of goods is knocked down, constitutes a separate and distinct contract and sale, or whether they altogether constitute one entire contract; and if the latter, then whether there had been such a partial delivery of the goods as to take the case out of the operation of the statute of frauds. In that case it was held, that though the articles were purchased at an auction sale and were numerous, and were struck off separately at separate and distinct prices, yet that the whole constituted but one entire contract, and that a delivery of a part of the goods sold renders the sale valid, as to the whole, within the statute of frauds. The doctrine of that case was confirmed in the court of errors, 20 Wend. 431, where some additional facts are stated, as that the goods purchased were not only several different articles, at different bids, at distinct prices for each, but also that these articles were entered upon different catalogues; as though, in this case, the stable stock had been entered on one catalogue, and the furniture and carpets on another. The same doctrine is held in *Baldey* v. *Parker,* 3 Dowl. & Ryl. 222; and *Elliott* v. *Thomas,* 3 Mees. & Wels. 170; *Dyke* v. *Blake,* 4 Bing. N. C. 463; *Scott* v. *Eastern Cos. Railway Co.,* 12 Mees. & Wels. 33; *Hart* v. *Mills,* 15 Mees. & Wels. 85.

It could make no difference whether the auction continued one day or several days, upon the same stock of goods or the same lot of hotel property, the terms of sale being the same upon the whole. Suppose the terms of sale at an auction to be, that all sums less than thirty-three dollars shall be paid down in cash, but that, upon all sums exceeding that amount, a credit of ninety days is to be given, with approved securities. At the close of the auction, whether it had continued one day or three days upon the same lot of goods, sold upon the same terms, the purchaser comes forward to settle, and finds that he has bought twenty different articles, the price of either one of which alone is less than thirty-three dollars, but in the aggregate they amount to three hundred dollars. We think the universal practice is, and that the uniform understanding would be, that he was entitled to the ninety days' credit on the whole sum, because, in the aggregate, his purchases amounted

to more than thirty-three dollars. Aside from the binding force of the memorandum in writing which an auctioneer might make, there would be no substantial difference between that case and a purchase of the same articles at the same prices at private sale. *Baldey* v. *Parker*, *supra*, & S. C., 2 Barn. & Cress. 37. *Mills* v. *Hunt*, 20 Wend. 431 ; *Coffman* v. *Hampton*, 2 Watts & Serg. 577 ; *Barclay* v. *Tracy*, 5 Watts & Serg. 45.

In the case before us, the terms of the sale were cash on delivery. In general, the knocking down of the property to the highest bidder operates as a delivery of the property if it is present and movable, such as these four articles enumerated in the case were, and the same would be true of the stable stock, whether horses, carriages, harnesses, or other property ; and that seems to have been the understanding here, .so far as that stock was concerned, which was not only delivered, but accepted and taken away, but not paid for at the time, nor was it at all until after the commencement of this suit. How was it with the other property ?

When the terms of sale are cash on delivery, as in this case, the vendor has a right to hold a lien upon the property for the payment, and may hold it till the price is paid, if he choose. Chitty on Con. 374, 375, 427–429, and cases cited. But, as a general rule, the property in the goods sold at auction passes to the purchaser if there is nothing to be done to the property before its delivery, either to separate it from other property, or to put it in condition to be ready for delivery. In this case, everything was put in condition to be delivered : even the carpets had been measured, scheduled, and numbered, and were sold by the yard, the vendor stating the number of yards in each. This would amount to a warranty of quantity as well as of title, which is entirely consistent with the theory that the property passed at once to the vendee. 2 Kent's Com. 480; *Vincent* v. *Germond*, 11 Johns. 283 ; 1 Smith's Lead. Cases 308. We think the understanding was, that the property should pass at the sale, especially as the vendor was intending to sell his tavern-house, as well as his furniture and stock, at this sale, and close up his business. If the man who bid off the tavern-house had completed his purchase and taken a deed of the premises, it seems evident that all parties would have understood that these carpets were there as the property of the defendant.

There was nothing more to be done by the vendor. The carpets were measured and scheduled. The vendor guaranteed in that way the title and the quantity, and the vendee could examine the quality for himself, and did so, and bought by the yard. If the defendant wished to test the measure, or to make further examinations in that regard, he should have done so at once ; but he did nothing of the kind, and the defendant's evidence tends to show that he did not desire to do anything more, but considered the property as his own. All the evidence offered on both sides tends to show that the defendant would have taken the property away before the fire, had he not been requested by the plaintiffs to leave it there, either for the benefit or convenience

of one party or the other, which presupposes the defendant's right to take it at any time, and to control it.

Although in a case like this, where the price was to be paid on delivery, the delivery of the property without payment would not be conclusive of the waiver of the payment—*Ferguson* v. *Clifford*, 37 N. H. 86; *Dudley* v. *Sawyer*, 41 N. H. 326—yet such would be its strong tendency; and we cannot doubt that in this case the vendor, knowing the vendee to be perfectly responsible, was willing to waive the payment and relinquish his lien upon the property, and did so, and that the property passed to the defendant at the sale. Such was evidently the case with the stable stock; and we think, upon the evidence, that the property all stood alike, that there was no distinction between the stable stock and the furniture, and that a delivery of a part of this property, and its acceptance by the vendee, was sufficient to take the whole purchase out from the operation of the statute of frauds, and that the title to all the property passed to the defendant at the time of the sale.

In New Hampshire we have no direct authority upon this point. In *Messer* v. *Woodman*, 22 N. H. 172, 176, Woods, J., says, "If the action were brought to recover damages for the non-performance of the contract of sale, the effect of the statute of frauds upon the contract might become a material matter of inquiry, and it would in that view be material whether a sale by separate lots and constituting separate contracts of sale of each lot is shown by the case, or whether the sale of the several parcels of hay may be regarded as one sale of all the parcels." He quotes Chitty on Contracts, and some other authorities which have since been overruled or essentially modified, but decides nothing, as no question of that kind was raised in the case.

In *Gilman* v. *Hill*, 36 N. H. 311, 318, Eastman, J., says, "If the sale be of a number of articles at the same time, neither of which is of the price of $33, but which in gross exceed that sum, the contract is deemed to be entire and to fall within the statute"—quoting *Baldey* v. *Parker*, 2 Barn. & Cress. 37; Comyn on Contracts 85;—see, also, *Hinde* v. *Whitehouse*, 7 East 558; *Shepherd* v. *Pressey*, 32 N. H. 55.

We think the amendment was properly allowed. *Wilson* v. *Eaton*, 5 N. H. 141; *Stevenson* v. *Mudgett*, 10 N. H. 338; *Bailey* v. *Smith*, 43 N. H. 409; *Brackett* v. *Crooks*, 24 N. H. 173; *Davis* v. *Hill*, 41 N. H. 329.

*Judgment for the plaintiff.*